**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| JAMES D. BAILEY, II | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:07-CV-0578-PS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

James Bailey's claim for Disability Insurance Benefits ("DIB") from the Social Security Administration was denied largely because the ALJ discounted evidence from Bailey's treating doctor and further found that Bailey lacked credibility in certain respects. In this appeal, Bailey challenges these decisions as well as the ALJ's finding that before attaining age 55, Bailey could perform a significant number of jobs in the national economy. There is ample support for all of these findings in the record. So the ALJ's decision is affirmed.

**I. BACKGROUND**

At the time of the alleged onset of disability, Bailey was 50 years old, which is defined in the regulations as an individual approaching advanced age. Significantly, when Bailey turned 55, his age category changed to an individual of advanced age. Bailey has a high school education and speaks English. He worked as an auto body shop manager from 1981 to 1987 and an internal grind operator from 1987 to 1994. He claims that he has been disabled since February 24, 2000.

1

A. **Treating Physician Testimony**

In support of his DIB application, Bailey submitted medical records from his treating physician, Dr. Brubaker. [Tr. 165-79]. Dr. Brubaker first saw Bailey on May 18, 1999 but did not see him again until November 13, 2002. [Tr. 179, 20]. On January 7, 2003, Dr. Brubaker completed a form for Medicaid eligibility indicating Bailey's primary diagnosis as sleep apnea, for which he had a good prognosis with treatment. [Tr. 149, 154, 170]. Dr. Brubaker also indicated that Bailey had a primary diagnosis of COPD, mild to moderate in severity, with a fair prognosis, and that he had a secondary diagnosis of asthma, also with a fair prognosis with treatment. [Tr. 151, 154-55]. Dr. Brubaker indicated that Bailey's bones, joints, and extremities were normal but that Bailey had limitations in walking, pushing, pulling, and climbing, and concerning exposure to temperature changes, dust, fumes, and gases. [Tr. 153, 157]. He also noted that Bailey's functional limitations were expected to improve with regular care and treatment. [Tr. 155]. Dr. Brubaker wrote that Bailey's limitations were substantial enough to prevent him from performing his usual occupation, but not to preclude him from gainful employment. [*Id.*]. He opined that Bailey "should be able to perform some meaningful employment with modification." [*Id.*].

In October 2003, Bailey visited Dr. Brubaker, but the progress notes are largely illegible. [Tr. 254-56, 168]. In another visit on February 28, 2005, Dr. Brubaker noted Bailey's report of depression. [Tr. 259]. Dr. Brubaker's clinical notes from 2006 are also illegible. [Tr. 264-65].

On February 19, 2007, Bailey's attorney deposed Dr. Brubaker. [Tr. 276]. Dr. Brubaker stated that he initially met Bailey on May 18, 1999 and that his primary diagnosis of Bailey was COPD. [Tr. 279]. Dr. Brubaker indicated that Bailey's COPD had worsened over the years.

[*Id.*]. He stated that, as of 2000, Bailey could sit for an entire 8-hour day, walk for 10 or 15 minutes, and stand for 2-4 hours. [Tr. 281]. He did not require a cane to walk, but could lift or carry only 5 pounds occasionally. [Tr. 282]. Bailey could occasionally stop and reach above shoulder level; could kneel, climb, crouch, or crawl; but could never be exposed to temperature extremes, humidity, pulmonary irritants, toxic fumes, or cleaners. [Tr. 284]. Dr. Brubaker further opined that Bailey had no restriction on his ability to hear, speak, or balance. [*Id.*]. He felt that Bailey's impairments had progressed and had become more severe since his 1999 and 2003 statements regarding a sedentary restriction. [Tr. 279, 286]. Dr. Brubaker stated that, in 2000 and since then, Bailey could not "hold any employment that would require any exertion whatsoever." [Tr. 280].

### B. Evidence from the Consulting Physicians

On February 12, 2003, Bailey underwent an evaluation with Dr. Jan Earl Warner, Ph.D., for the purposes of Medicaid eligibility. [Tr. 128]. Dr. Warner recorded Bailey's complaints of confusion and disorientation, COPD, asthma, and sleep apnea. [*Id.*]. Bailey denied having a history of psychiatric treatment, but admitted to a "problem with drinking" when confronted about having alcohol on his breath on the day of the evaluation. [Tr. 129]. Bailey admitted to drinking a pint of hard liquor the previous day. [*Id.*]. Dr. Warner observed that Bailey appeared moderately anxious and depressed, though he was not irritable, and Bailey's attention and concentration skills were mildly diminished. [Tr. 130]. On mental status examination, Bailey was fully oriented; his knowledge of general information was average; his memory was average; his calculations were mildly below expectance; his abstract reasoning was average; and his judgment and insight were adequate. [*Id.*]. Dr. Warner recorded that Bailey cared for his

3

personal needs without assistance, cooked, cleaned, shoveled, raked, drove his own car, and managed his money. [*Id.*]. Dr. Warner summarized that Bailey was suffering from difficulties with alcohol dependence and underlying difficulties with anxiety and depression. [*Id.*]. He diagnosed generalized anxiety disorder, adjustment disorder, and alcohol dependence. [*Id.*]. He assigned a global assessment of functioning ("GAF") score of 45, indicating serious impairment, and recommended that Bailey resume vocational rehabilitation, attend Alcoholics Anonymous, and participate in an antidepressant/anti-anxiety medication trial. [*Id.*].

On May 15, 2003, at the request of the state agency, Michael E. Holton, M.D. performed a consultative physical examination of Bailey. [Tr. 161]. On examination of Bailey's lungs, Dr. Holton found that Bailey's breath sounds were moderately diminished throughout the lung fields with scattered expiratory wheezes. [Tr. 162]. Although examination of his extremities was normal, Dr. Holton diagnosed COPD, chronic low back pain, possible lumbar radiculopathy, degenerative arthritis of the left knee, hypertension, apparent obstructive sleep apnea, generalized anxiety disorder, and apparent post fracture deformity of the left upper extremity. [Tr. 163]. A subsequent pulmonary function study revealed severe obstructive airways disease and possible emphysema. [Tr. 184].

A state agency physician, Dr. Sands, M.D., reviewed Bailey's record and opined that Bailey was able to occasionally lift 20 pounds and frequently lift 10 pounds, and stand, walk, and sit for 6 hours. [Tr. 214]. Dr. Sands opined that Bailey could not climb ladders, ropes, or scaffolds but could perform other postural activities occasionally. [Tr. 215].

On January 21, 2004, Bailey underwent a consultative physical examination by Philip S. Budzenski, M.D. [Tr. 206]. Dr. Budzenski observed that Bailey ambulated with a normal gait

4

and got on and off the examination table without difficulty. [Tr. 207]. He was able to hear and understand normal conversation tones; his memory for recent and remote medical events was preserved; and his intellectual function was normal. [Tr. 208]. After examination, Dr. Budzenski said that due to occasionally elevated blood pressure, Bailey should be limited to lifting 50 pounds, but that no other limitations were indicated. [Tr. 211]. Another state agency physician, B. Whitley, M.D., concurred. [Tr. 220].

On August 23, 2004, at the request of the state agency, Robert Walsh, Psy.D. performed a mental status examination on Bailey. [Tr. 225-27]. Dr. Walsh observed that Bailey came across as having possible cognitive deficits; his attention and concentration were fair; and his insight and judgment appeared poor. [Tr. 226]. Dr. Walsh diagnosed anxiety disorder and assigned a GAF score of 55, indicating moderate symptoms or impairment. [Tr. 227]. He summarized that Bailey expressed symptoms of anxiety that were somewhat difficult to differentiate from his medical problems and noted that a formal memory and intellectual evaluation may help aid in Bailey's diagnosis. [*Id.*]. Dr. Walsh also noted that Bailey should benefit from medication management and outpatient therapy. [*Id.*].

On October 17, 2004, in response to a request by the state agency, Patrick W. Utz, Ph.D. performed the Wechsler Memory Scale-III on Bailey. [Tr. 228]. Dr. Utz remarked that Bailey was "reasonably cooperative" during the test, but that Bailey seemed dramatic in describing his problems and responding to the test. [Tr. 229]. Dr. Utz felt that Bailey's behavior of trying to recall a fact from memory, when he clearly could not remember it, seemed "a bit staged." [*Id.*]. Bailey scored within the average range on the test, with no evidence of a memory disorder. [*Id.*].

5

## C. Vocational Expert

The ALJ asked the vocational expert to consider an individual who had the same age, education, and past work experience as Bailey who was limited to light, unskilled work along with other restrictions. [Tr. 298]. The vocational expert responded that such an individual could do the job of inside security guard, which was on the low-end of semi-skilled, with a little over 1,300 jobs in region II, which consists of St. Joe, Elkart, and Marshall County. [Tr. 298]. The ALJ asked whether the region included the county in which Bailey resided, Fulton County, and the vocational expert responded, "Yeah . . . they sometimes add it on. Right. That's the next one from Marshall." [Tr. 298]. The expert also testified that such an individual could perform the light, unskilled jobs of office helper (325-350 jobs regionally), mail sorter (350 jobs regionally), and information clerk/motor transportation (100 jobs regionally). The vocational expert stated that the number of these jobs on the state level would increase by "approximately times ten." [Tr. 299].

## D. The ALJ's Findings and Conclusion

The ALJ denied Bailey's claim because he retained the ability to perform unskilled, light work, from the date he alleged he became disabled, February 24, 2000, through February 24, 2005, the date he turned 55. [Tr. 14.] The ALJ reached his conclusion after considering the entire record and setting forth several findings. [Tr. 17–22]. In doing so, the ALJ applied the five step sequential evaluation process. The problem with Bailey's claim arose at step five. The ALJ found that although Bailey had severe impairments, Bailey retained the residual functional capacity ("RFC") to perform light exertional work. The ALJ found that Bailey could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, and sit, stand, and walk 6 hours

6

in an 8-hour workday; but that he could never climb ladders, ropes, or scaffold, or crawl or crouch, and had to avoid concentrated exposure to extreme changes in temperatures, humidity, dust, gases, fumes, odors, and chemicals. [Tr. 18]. Bailey thus could not perform any of his past relevant work, given his limitations. [Tr. 21].

Of central importance to the present dispute, the ALJ's finding that Bailey was not disabled prior to February 24, 2005 was based in part on a perceived inconsistency in Bailey's personal physician's own statements. In 2003, Dr. Brubaker said that Bailey's limitations were not substantial enough to preclude him from performing gainful employment, whereas in 2007, he stated that, in 2000 and since then, Bailey could not hold any employment that would require any exertion whatsoever. [Tr. 155, 280]. In addition, Dr. Brubaker's 2007 opinion differed from the 2003 opinions of Dr. Sands and Dr. Whitley. [Tr. 20, 214, 220, 282]. In 2007, Dr. Brubaker said that, as of 2000, Bailey could lift or carry only 5 pounds occasionally, whereas, in 2003, both Dr. Sands and Dr. Whitley said that Bailey was able to occasionally lift 20 pounds and frequently lift 10 pounds. *[Id.]*.

As part of his analysis, the ALJ considered Bailey's age in determining whether he was disabled. [Tr. 21, 22]. Bailey was 50 years old on February 24, 2000, the alleged onset date of his disability. [Tr.21]. This is defined in the regulations as an individual closely approaching advanced age. [*Id.*] On February 24, 2005, Bailey attained 55 years of age and, pursuant to 20 C.F.R 404.1563 and 416.964, his age category changed to an individual of advanced age. [Tr. 22]. The ALJ also considered transferability of job skills, noting that prior to February 24, 2005, transferability of job skills was not material to the disability determination because using the Medical-Vocational Rules as a framework supports a finding that a claimant is "not disabled,"

7

regardless of whether the claimant has transferable job skills. [Tr. 21]. Given this ability, along with his age, education, and past work experience, the ALJ found that prior to his fifty-fifth birthday, Bailey could perform a significant number of jobs in the national economy. [Tr. 21-22]. However, after Bailey turned 55, his age category changed thereby indicating a finding of disability as of that date. [Tr. 22]. The ALJ noted that beginning on February 24, 2005, when transferability did become relevant to Bailey's place on the Medical-Vocational Rules grid, Bailey was not able to transfer job skills to other occupations. [Tr. 21] Accordingly, Bailey was found not disabled prior to June 30, 2001, the date he was last insured, which is the relevant time period for purposes of DIB eligibility. *Id.*; 20 C.F.R. §§ 404.131, 404.315(a)(1). However, the ALJ did find that Bailey was eligible to receive supplemental security income benefits beginning on his fifty-fifth birthday. [Tr. 22-23]. This is because, as mentioned, when Bailey turned 55 the criteria changed for the jobs he could perform. Therefore, although the ALJ found that Bailey was not disabled prior to February 24, 2005, he found that Bailey became disabled on that date and continued to be disabled through the date of the ALJ's decision. [*Id.*]

## II. DISCUSSION

Section 405(g) of the SSA limits the scope of judicial review of the Commissioner's final decision by providing that "any fact, if supported by substantial evidence, shall be conclusive," and, thus, the court's power to modify, affirm, or reverse the decision of the Commission is restricted. 42 U.S.C. § 405(g). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Review of the ALJ's findings is deferential. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). So where "conflicting evidence allows reasonable minds to differ as to

8

whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) (citations omitted).

To qualify for benefits, a claimant must establish an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A five step test is used to guide the process. *Singleton v. Bowen*, 841 F.2d 710, 711 n.2 (7th Cir. 1988) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987)); 20 §§ C.F.R. 404.1520. The Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops [the] inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988). A claimant has the burden through at least step four, where the individual's RFC is determined. *Yuckert*, 482 U.S. 137, 146 n.5; 20 C.F.R. §§ 404.1545, 416.945. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). If the Commissioner shows this, then the claimant is not disabled. *Nelson*, 855 F.2d at 504 n.2. Only the fifth step in the process is at issue in this appeal.

## A. The ALJ's Finding that Bailey Could Perform Unskilled Work is Supported by Substantial Evidence.

The first issue is whether the ALJ reasonably rejected Dr. Brubaker's February 2007 opinion that, in 2000 and since then, Bailey could not "hold any employment that would require any exertion whatsoever." As long as an ALJ provides reasoning, he may disregard a treating physician's medical opinion if it is internally inconsistent or inconsistent with the opinion of a consulting physician, *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004), or if it is not supported by objective medical findings. *Id.; Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).

First, Dr. Brubaker's February 2007 opinion contained internal inconsistencies. In his 2007 opinion, Dr. Brubaker twice stated that Bailey's condition had worsened from 2000 to 2007. Yet he also stated that Bailey had the same limitations in July 2000 as Dr. Brubaker had identified in February 2007. The ALJ appropriately recognized this as an inconsistency because if Bailey's condition had truly worsened, one would reasonably expect his functional limitations to have increased over the span of seven years.

Second, Dr. Brubaker's opinion was inconsistent with what he had previously stated. In 2007, Dr. Brubaker testified that in 2000 (and since 2000), Bailey could not hold employment that would require any physical exertion whatsoever. But as the ALJ pointed out, in January 2003, Dr. Brubaker stated that Bailey's limitations were not substantial enough to preclude gainful employment and that Bailey should be able to perform "some meaningful employment with modification." Bailey attempts to reconcile Dr. Brubaker's inconsistent statements by focusing on the wording of the questions posed to him. But the difference in the wording of the questions is neither here nor there. The fact of the matter is that Dr. Brubaker stated in 2007 that Bailey could *not* perform work that required *any exertion* since 2000. Yet four years earlier, in

10

2003, Dr. Brubaker acknowledged that Bailey *was* able to perform meaningful employment *with modification*. These statements are plainly inconsistent, or so the ALJ could reasonably have found. It was reasonable, therefore, for the ALJ to reject Dr. Brubaker's opinion based on his own inconsistent statements.

Third, the lifting restriction noted by Dr. Brubaker in his February 2007 opinion was inconsistent with the opinion of state agency physicians Drs. Sands and Whitley and the opinion of Dr. Budzenski. This was another reason why the ALJ could reasonably choose to reject Dr. Brubaker's 2007 opinion. [*See* Tr. 20, 214, 220, 282].

Fourth, Dr. Brubaker's opinion lacked supportive objective medical evidence. Dr. Brubaker first saw Bailey in May 1999, but did not see him again until November 2002 – two-and-a-half years later. Dr. Brubaker's handwritten progress notes were meager, containing only minimal medical findings from actual examinations. It is true that a test performed by another physician (Dr. Michael Holton) showed that Bailey had COPD just like Dr. Brubaker had diagnosed. But having COPD does not automatically result in a finding of a disability. Rather, it gets included in the RFC determination which is what the ALJ did here. So there was no objective evidence supporting Dr. Brubaker's opinion that Bailey had a total disability.

In sum, the ALJ reasonably rejected Dr. Brubaker's February 2007 opinion, and, consistent with *Skarbek*, 390 F.3d at 503 and *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998), the ALJ gave appropriate reasons for such rejection, including the various reasons identified above. The ALJ could thus rely on other medical opinions of record. *See* 20 C.F.R. § 404.1527(f)(2)(I); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Like in *Scheck*, the reasons for giving substantial weight to a treating physicians' opinion

11

are absent in the instant case. *Id*. at 702-03. In *Scheck*, the petitioner's treating physician was unable to closely follow him after he relocated to a different state. The court determined that "[i]t would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments where *in fact, there is no detailed or longitudinal view*." *Id.* at 702 (emphasis in original). The same is true in Bailey's case, where his treating physician, Dr. Brubaker, first saw Bailey in May 1999, but did not see him again for two-and-a-half years, especially where Dr. Brubaker's progress notes are so paltry. Based on *Scheck*, the ALJ's decision to discredit Dr. Brubaker's opinion and rely instead on other medical opinions of record was appropriate.

Bailey argues that I should read *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) to mean that a treating physician's opinion is automatically entitled to greater weight than the opinions of consulting physicians. But that is a mis-reading of *Gudgel*. *Gudgel* does not require an ALJ to give greater weight to a treating physician's opinion than to other opinions without regard to the circumstances. It merely holds that if an ALJ decides to disregard a treating physician's opinion, where the treating physician's opinion is supported by test results and the claimant's subjective symptoms, the ALJ must do more than point to an inconsistency between the treating physician's opinion and the state agency physician's opinion to support that decision. *Gudgel*, 345 F.3d at 470. The ALJ did that in this case. He rejected Dr. Brubaker's February 2007 opinion for the reasons outlined above. So nothing in *Gudgel* mandates a reversal here.

Additionally, holding that a claimant's treating physician's opinion should automatically be given more credit than that of a consulting or reviewing physician would mean that whenever

12

a record contains conflicting opinions from a treating physician and a state agency physician, an ALJ must automatically rely on the treating physicians' opinion. This would run contrary to the regulatory requirement (20 C.F.R. § 404.1527) that all medical evidence, including the opinions of treating and non-treating physicians, should be evaluated. *See, e.g., Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citing *Holfslien v. Barnhart*. 439 F.3d 375, 376 (7th Cir. 2006) ("Once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.").

The next issue is whether the ALJ properly considered Bailey's psychological problems along with his medical problems. Of course, the ALJ had a duty to consider Bailey's medical situation as a whole. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Specifically, he had a duty to consider the disabling effects of Bailey's psychological impairments on Bailey's overall condition and the extent to which those mental impairments could have exacerbated Bailey's underlying physical impairments and affected his ability to work. *Gentle*, 430 F.3d at 868. The ALJ adequately fulfilled this duty. Indeed, the record is replete with instances in which the ALJ considered Bailey's mental impairments in view of his physical impairments and ability to work.

In his discussion of Bailey's severe impairments, the ALJ reviewed the psychological evidence in detail. First, the ALJ acknowledged Dr. Warner's February 2003 assessment and noted Dr. Warner's concern for alcohol dependence and his recommendation that Bailey participate in vocational rehabilitation. Second, the ALJ discussed Dr. Walsh's August 2004 assessment in which Dr. Walsh diagnosed Bailey with anxiety disorder. The ALJ specifically referenced Dr. Walsh's opinion – that it was difficult to differentiate Bailey's anxiety problems

13

from his medical problems – and then noted that Dr. Walsh had recommended memory and intellectual evaluation and that the state agency had requested that Dr. Utz perform that testing. Third, the ALJ took into account Dr. Utz's opinion concerning the interplay between Bailey's difficulty breathing and the anxiety Bailey experienced. The ALJ explicitly noted that after Bailey's memory testing showed scores in the average range, Dr. Utz found no anxiety disorder and remarked that Bailey's report of panic attacks (occurring while having difficulty breathing) were merely a normal reaction to experiencing shortness of breath. The record shows that the ALJ considered assessments made by the psychological doctors concerning Bailey's possible alcohol dependence, Bailey's possible memory problems, and the interplay between Bailey's breathing difficulties and his anxiety disorder. The ALJ properly reached its ultimate conclusions using these mental impairments as part of its analysis.

In addition, when discussing whether Bailey had the RFC to perform a restricted range of unskilled, light work activity, the ALJ reviewed Bailey's mental and physical impairments in combination, not his physical impairments in isolation as Bailey contends. At one point, the ALJ considered Bailey's shortness of breath, followed by his complaints of having "trouble focusing mentally," followed by his complaints of difficulty sleeping, followed by his capacity for sitting, standing, and engaging in other physical activities such as crouching, kneeling, and crawling. [Tr. 18]. This illustrates that the ALJ considered Bailey's mental and physical impairments in combination. Following these considerations, the ALJ then discussed Dr. Utz's observations regarding Bailey's credibility. [Tr. 19]. Bailey states that the ALJ considered the opinions of Bailey's psychological doctors only when the ALJ concluded that Bailey lacked credibility. However, as these excerpts demonstrate, to suggest, as Bailey does, that the ALJ considered

14

Bailey's mental impairments *only* in the context of assessing Bailey's credibility and not in combination with his physical impairments, starkly mis-characterizes the record.

The final issue relating to whether the ALJ's findings were supported by substantial evidence concerns the ALJ's credibility determinations. An ALJ can't just say "I don't believe the claimant." He must explain *why* he doesn't believe him. *See Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). Here, the ALJ adequately explained his determination that Bailey lacked credibility relating to the intensity and severity of Bailey's impairment. [Tr. 19]. The ALJ pointed to Dr. Utz's observations that Bailey seemed dramatic and a bit staged when describing his problems and in his responses during the memory testing. Utz concluded that the fact that Bailey might have exaggerated his limitations on examination "limit[ed] [Bailey's] overall reliability." [Tr. 19]. Bailey puts forth an alternate possible interpretation of Dr. Utz's notes. He claims that Bailey was merely embarrassed when he could not recall certain facts that Dr. Utz asked him to recall and that such embarrassment should not be misinterpreted as a lack of credibility. But this misses the point. While alternate possible interpretations of the evidence may exist, all that matters is whether the ALJ's interpretation of the evidence is reasonable, which it is.

Bailey also ignored the other factors identified by the ALJ when making his credibility finding. The ALJ noted that, although Bailey reported having back pain, the treatment plan for Bailey's back pain was very conservative and had improved. In addition, Bailey was able to perform activities of daily living, had done odd jobs over the years, helped his mother with the lawn, and reported to Dr. Utz that in 2003 he had even mowed his neighbor's lawn. The ALJ reasonably determined that these activities were inconsistent with Bailey's claims of physical

15

limitations, thereby undermining Bailey's credibility. Therefore, the ALJ's determination regarding Bailey's credibility was reasonable and supported by substantial evidence.

**B.     The ALJ's Finding that Bailey Could Perform a Significant Number of Jobs in the Relevant Area is Supported by Substantial Evidence**.

Based on the testimony from a vocational expert, the ALJ found that – given his limitations as reflected in his RFC – Bailey could hold a number of jobs in the regional economy. Bailey claims that this was an error. The statute governing this topic is a little odd. On the one hand, it says that the focus must be on whether "work exists in the national economy, regardless of whether such work exists in the immediate area in which he lives . . ." 42 U.S.C. § 423(d)(2)(A). It then states that the term "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* The caselaw attempts to clear up this ambiguity by stating that "[t]he test is whether [the claimant] is so disabled that there are no jobs *in reasonable proximity* to where she lives that she is physically able to do." *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (emphasis added).

The vocational expert demonstrated that a significant number of jobs that Bailey could perform were available in region II, which included St. Joe, Elkhart, and Marshall County. [Tr. 22]. Bailey lives in Fulton County which abuts Marshall County. But according to the vocational expert, Fulton County often is included in region II. In any event, the jobs that are available in the three other counties are "in reasonable proximity" to Bailey's residence in Fulton County, and that is all that is required.

## III. CONCLUSION

The ALJ adequately supported his opinion with substantial evidence. The final decision of the ALJ is **AFFIRMED**.

**SO ORDERED.**

ENTERED: December 3, 2008

/s Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT